DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JESSE MCINTOSH,** as Personal Representative of the Estate of **JAMES MCINTOSH,** deceased, on behalf of **JESSE MCINTOSH** and **DYLAN MCINTOSH, JAMES MCINTOSH's** minor children,
Appellants,

v.

**PROGRESSIVE DESIGN AND ENGINEERING, INC., MASTEC NORTH AMERICA, INC., GBF ENGINEERING, INC., BROWARD COUNTY, STATE OF FLORIDA DEPARTMENT OF TRANSPORTATION, TEI ENGINEERS & PLANNERS** and/or **HNTB CORPORATION,** a successor corporation, and **CITY OF PEMBROKE PINES,** jointly and severally,
Appellees.

No. 4D12-2335

[March 25, 2015]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jeffrey Levenson, Judge; L.T. Case No. 07-25039CACE.

Bard D. Rockenbach of Burlington & Rockenbach, P.A., West Palm Beach, and Todd Middlebrooks of Middlebrooks & Middlebrooks, P.A., Fort Lauderdale, for appellant.

Scott A. Cole, George R. Truit and Kristen A. Tajak of Cole, Scott & Kissane, P.A., Miami, for appellee Progressive Design and Engineering, Inc.

**ON MOTION FOR REHEARING AND CERTIFICATION**

MAY, J.

We deny the motion for rehearing and for certification. However, we withdraw our previously issued opinion and substitute the following.

A tragic car accident resulted in the death of the plaintiff's father. He now appeals an adverse jury verdict in a negligence action against a company that designed the traffic signals for the intersection. He argues:

(1) the trial court erred in finding that the *Slavin*[1] doctrine applied to the design company; (2) the evidence did not support the jury's finding that the completed intersection had been "accepted" before the accident; and (3) the design defect was latent. We find no error and affirm.

*The Accident*

The plaintiff's father was exiting a mobile home park, traveling eastbound through an intersection, when he collided with a truck traveling southbound on the cross-street. The traffic signals at the intersection allowed a driver exiting the mobile home park to rely upon a traffic signal further out into the intersection meant for other traffic. This resulted in the driver overlooking the closest traffic signal that was meant to control traffic exiting the mobile home park.

*Design and Construction of the Intersection Traffic Signals*

The City of Pembroke Pines asked the Florida Department of Transportation ("FDOT") to install traffic signals at the intersection. FDOT hired TEI Engineers and Planners ("TEI"), who in turn, hired Progressive Design and Engineering, Inc. ("design company") to design the traffic signals for the intersection. The design company's scope of work included signal design and interconnect plans. The design plans were required to be in accordance with the Manual on Uniform Traffic Control Devices.

The design company submitted the traffic signal design to FDOT, which provided it to Broward County Traffic Engineering ("Broward County")[2], the police department, and various FDOT departments associated with the project. The parties reviewed the plans and provided electronic comments to the design company's engineer of record. The design company's response had to be approved by FDOT and the original commenter.

During the review process, an FDOT employee commented that a special signal might be necessary to make sure drivers did "not see the wrong indication from this quite large almost diamond like interchange design." The design company responded to the comment; FDOT approved the response. A Broward County employee also participated in reviewing and commenting on the plans for signal installation and controls.

---

[1] *Slavin v. Kay,* 108 So. 2d 462 (Fla. 1959) (holding that a contractor is not liable for patent defects after acceptance of a construction project by the owner).
[2] Broward County was involved in the review process because it was ultimately responsible for maintaining the timing and phasing of the signalization for a fee.

According to the plaintiff's expert, an engineer and former FDOT employee, FDOT probably spent a "couple of hours" reviewing the design plan, compared to the "hundreds of hours" the design company would have spent to design the traffic signals. He testified that it was impossible for FDOT to have the same knowledge as the design company. He also testified that the design drawings did not include a tree that was located in the median.

FDOT hired EAC Consulting ("EAC") to provide additional engineering review of the plans. EAC certified the plans to FDOT in February 2003. FDOT then decided the project was ready for the final engineering submittal. After the design plans were reviewed and almost complete, a meeting was held at the intersection to review the design in the field. FDOT, EAC, Broward County, GBF Engineering ("GBF"), and the design company attended this meeting.

FDOT accepted the final comments in 2003. FDOT's project manager was unaware of any further consultation with the design company. This was the last meeting the design company attended for the project; it had finished its work under the sub-contract with TEI. The design company did not receive any further change requests.

The design company signed and sealed the design plans and sent them to TEI, which sent them to FDOT, which sent them to Tallahassee. In Tallahassee, the plans were reviewed to ensure compliance with the guidelines and sent out for contractor bidding. The project was generally built as designed, but the construction team had some ability to make modifications if needed.

The selected contractor worked with GBF as the construction engineering inspector. GBF oversaw field operations to ensure the contractor's compliance with the design plans. The completed project was inspected and initially approved on August 10, 2004. Broward County, the contractor, GBF, and FDOT, were at the inspection site.

A Broward County employee testified that its acceptance was conditional, with final acceptance occurring after the burn-in period. Broward County did not object to the traffic signal sequencing and conditionally approved the intersection on August 10th. On that date, the signals became fully operational, using full color signals instead of flashing yellow signals.

The design company's engineer of record described the burn-in period

as a contractor warranty period where the contractor maintained the traffic signals if something went wrong. FDOT was in control of the intersection and the only entity that could make changes. Broward County technicians inspected all aspects of the traffic signals. After the burn-in period, FDOT would transfer control of the intersection to Broward County for maintenance purposes. The accident occurred sixteen days into the burn-in period. Broward County did not take final control of the intersection until January 2005.

The plaintiff's accident reconstruction expert testified the traffic signal design was the primary cause of the collision because the line of sight would give the driver the ability to focus on the second set of signals located farther out in the intersection, but not the first set of signals located just above the stop bar for people exiting the mobile home park. A mobile home park resident testified that a tree was located in the median at the mobile home park's entrance. The tree also caused a problem because it blocked the view of the first set of traffic signals.

The plaintiff moved for directed verdict based on the *Slavin* doctrine, arguing that Broward County had not "accepted" the project because the burn-in period had not ended. The trial court denied the motion. The design company also moved for directed verdict based on the *Slavin* doctrine, arguing the project was completed, accepted, and the defects known or reasonably discoverable by FDOT prior to the accident. The trial court also denied that motion, finding that the issues were better left for the jury.

Although the plaintiff's counsel objected to *Slavin*'s use in the jury instructions, he helped draft the instruction without waiving his objection. Both parties agreed that if a *Slavin* instruction was included, it would discuss acceptance of the design.

The trial court instructed the jury on *Slavin* and directed that "if you find that the design of the intersection . . . was accepted by [FDOT] before James McIntosh was injured, you must determine whether [FDOT] knew about the defects." The trial court then instructed the jury, "[i]f you find that [FDOT] either knew of the defects or should have discovered the defects in conducting a reasonably careful inspection, then your verdict should be for [the design company]."

The jury returned a verdict finding the design company negligent in its traffic signal design, which was the legal cause of the plaintiff's father's death. But, the jury found the negligent design was accepted and discoverable by FDOT with the exercise of reasonable care.

4

The plaintiff moved for a new trial or judgment in accordance with his motion for directed verdict, arguing that *Slavin* did not apply to the claim because the evidence failed to show that Broward County accepted the project. The trial court denied the motions and entered final judgment in favor of the design company.[3] From the adverse judgment, the plaintiff now appeals.

On appeal, the plaintiff argues the trial court erred in applying *Slavin*, the evidence did not support a finding that Broward County accepted the completed intersection before the accident, and the design defects were latent. The design company responds that the evidence established the traffic signal design was accepted by FDOT before the accident. It also argues the design defect was patent, and that the jury verdict was supported by the evidence.

We have de novo review of the trial court's ruling on the motion for directed verdict. *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009).

The *Slavin* doctrine was born of the need to limit a contractor's liability to third persons. "[A] contractor who performs work does not owe a duty to the whole world . . . else the extent of his responsibility would be difficult to measure and a sensible man would hardly engage in the occupation under such conditions." *Slavin v. Kay*, 108 So. 2d 462, 464 (Fla. 1959). "The *Slavin* doctrine considers the respective liability of an owner and contractor, after the owner has resumed possession of the construction, for injuries to a third person for negligence of the contractor in the construction of the improvement." *Gonsalves v. Sears, Roebuck & Co.*, 859 So. 2d 1207, 1208 (Fla. 4th DCA 2003).

Under *Slavin*, "the liability of a contractor is cut off after the owner has accepted the work performed, if the alleged defect is a patent defect which the owner could have discovered and remedied." *Fla. Dep't of Transp. v. Capeletti Bros., Inc.*, 743 So. 2d 150, 152 (Fla. 3d DCA 1999). The contractor's work must be "fully completed before the owner becomes liable and the contractor is exonerated." *Gonsalves*, 859 So. 2d at 1209. The rationale is that "'[b]y occupying and resuming possession of the work the owner deprives the contractor of all opportunity to rectify his wrong.'" *Slavin*, 108 So. 2d at 466 (quoting *Casey v. Hoover*, 89 S.W. 330, 334 (Mo. Ct. App. 1905)).

---

[3] Other defendants were dismissed after settling with the plaintiff.

There are two requirements to be met before the *Slavin* doctrine will isolate a contractor from liability. First, the defect must be patent. *Kala Invs., Inc. v. Sklar*, 538 So. 2d 909, 913 (Fla. 3d DCA 1989) (citations omitted). "[T]he test for patency is not whether or not the condition was obvious to the owner, but whether or not the dangerousness of the condition was obvious had the owner exercised reasonable care." *Capeletti Bros., Inc.*, 743 So. 2d at 152 (citing *Sklar*, 538 So. 2d at 913).

The issue of whether a defect is patent or latent is usually a jury question. *Id.* (citing *Sklar*, 538 So. 2d at 914). The trial court recognized the factual nature of the patency issue and correctly submitted it to the jury.

Here, an FDOT employee discovered a potential design defect long before the accident. As our supreme court has noted, FDOT is a "highly knowledgeable and sophisticated purchaser." *Chadbourne, Inc. v. Vaughn*, 491 So. 2d 551, 554 (Fla. 1986). It "has at least as much knowledge about road construction as" a road construction contractor, and certainly that of a design company. *Id.* at 553. Even a mobile home park resident recognized that something was wrong with the traffic signals. The jury decided that the defect was patent. The evidence supported this finding.

The second requirement is "acceptance" of the work. The reason for this requirement is that at some point the contractor loses control of the work, and concomitantly loses the ability to alter or change it. If the defect is patent, "the owner is charged with knowledge of it, and the contractor is relieved of liability because it is the owner's intervening negligence in not correcting it which is the proximate cause of the injury." *Brady v. State Paving Corp.*, 693 So. 2d 612, 613 (Fla. 4th DCA 1997). That is the point of "acceptance."

The plaintiff argues that acceptance did not occur because the ninety-day burn-in period to allow the contractor to correct any errors had not ended, and Broward County had not taken over maintenance of the intersection. The design company responds that its work had been completed and accepted by FDOT months before the accident. It had no control after FDOT accepted its work, and had no ability to alter the work of FDOT or its contractor. In essence, the design company argues that FDOT stood in the shoes of the proverbial owner in *Slavin*. We agree with the design company.

The design company's duty as a sub-contractor was to design the traffic signals. The design company completed its duty under the contract before the construction was completed. FDOT accepted the plans, and put the

construction contract out to bid. The design company had no control of the project's construction or when the completed project would become operational. Responsibility for the construction rested with the contractor. Going operational was a decision to be made by FDOT and Broward County.

Our supreme court has held "that a paving contractor could not be liable for injuries caused by defects in a road after the repaving work had been *accepted by the Department of Transportation.*" *Easterday v. Masiello*, 518 So. 2d 260, 261 (Fla. 1988) (emphasis added) (citing *Chadbourne*, 491 So. 2d at 553). Here, FDOT accepted the design company's work, and the construction project was completed by August 10th, sixteen days before the accident.

The real dispute here is whether acceptance of the design company's work was to be by FDOT, which controlled the project and accepted the design company's design, or by Broward County, which would ultimately maintain the intersection. To answer that question, we need only apply the underlying premise of the *Slavin* doctrine and subsequent case law. That premise is the responsibility for a patent defect rests with the entity in control and with the ability to correct it.

"Acceptance" is the term applied for shifting the responsibility to correct patent defects to the party in control. In essence, acceptance will move along the timeline of a construction project, passing to each entity maintaining control of the work. This application makes perfect sense. Once an entity completes its work, and that work is accepted, the burden of correcting patent defects shifts to the entity in control. It is the controlling entity's intervening negligence in not correcting a patent defect that proximately causes the injury. *Brady*, 693 So. 2d at 613.

As between the parties to this construction project, FDOT was the entity to whom the design company owed its duty, because it controlled "acceptance" of the design company's work. In turn, Broward County controlled acceptance of FDOT's work. At each step along the timeline, the party in control bore the burden of correcting patent defects because its control prevented anyone else from doing so.

Our supreme court has acknowledged and reaffirmed *Slavin*'s vitality. It has applied it to shield a design engineer and architects. *See Easterday*, 518 So. 2d at 260; *Gustinger v. H.J.R., Inc.*, 573 So. 2d 1033, 1033–34 (Fla. 3d DCA 1991). Other Florida courts have applied *Slavin* in road construction scenarios. *See Chadbourne*, 491 So. 2d at 552–54 (applying *Slavin* to a contractor's repaving of a road); *Capeletti Bros., Inc.*, 743 So.

2d at 151–52 (applying *Slavin* to a guardrail after road construction, but reversing a summary judgment due to a genuine issue of material fact).

*Slavin* exists to limit the liability of contractors because "it would be unfair to continue to hold the contractor responsible for patent defects after the owner has accepted the improvement and undertaken its maintenance and repair." *Easterday*, 518 So. 2d at 261. We join in the acknowledgement that *Slavin* is necessary to place the burden of responsibility upon the entity that controls the environment.

The trial court did not err in permitting the jury to determine whether the defect was patent and whether the project was accepted. It also did not err in its instructions to the jury. The factual disputes on these issues precluded the court from deciding them as a matter of law for either side. While the jury found the design company negligent, and the legal cause of the plaintiff's father's death, it also found the design was accepted and discoverable (or patent) by FDOT with the exercise of reasonable care. The trial court correctly declined to disturb these findings which were supported by the evidence. We therefore affirm.

*Affirmed.*

DAMOORGIAN, C.J., and GROSS, J., concur.

\*　　　\*　　　\*

8